**FIRST EAGLE SOGEN FUNDS, INC., Plaintiff–Appellant,**

v.

**BANK FOR INTERNATIONAL SETTLEMENTS, Defendant– Appellee.**

**No. 01–7076.**

United States Court of Appeals, Second Circuit.

Argued March 5, 2001.

Decided June 7, 2001.

---

William J. Snipes, New York, N.Y. (David Gaukrodger, Mark E. Coyne, Julia M. Jordan, Richard J.L. Lomuscio, David J. Fioccola, Sullivan & Cromwell, of counsel), for Plaintiff–Appellant.

Jonathan I. Blackman, New York, N.Y. (Mitchell A. Lowenthal, Allyson W. Haynes, Gabrielle S. Friedman, Stephen T. Ostrowski, Cleary, Gottlieb, Steen & Hamilton, of counsel), for Defendant–Appellee.

Before WALKER, Chief Judge, OAKES and JACOBS, Circuit Judges.

OAKES, Senior Circuit Judge:

First Eagle SoGen Funds, Inc. ("First Eagle") filed for a temporary restraining order (TRO) to stop the buyback of publicly held shares of the Bank for International Settlements (the "Bank"). The United States District Court for the Southern District of New York, Richard Owen, *Judge,* denied the TRO on the ground that First Eagle had failed to establish the necessary irreparable harm. Because we find that the lack of any serious consequence from the denial of the TRO precludes us from exercising jurisdiction over this interlocutory appeal, we dismiss.

## BACKGROUND

The Bank, a financial institution in Basel, Switzerland, was chartered in 1930 to facilitate the collection and distribution of Germany's war reparations from World War I. Its organizing purpose was to promote the cooperation of central banks in carrying out international financial operations. Although chartered under Swiss law, the Bank's charter and bylaws, called Statutes, expressly provide that it is not subject to the domestic corporate law of any of its signatory states, but, rather, to the governance of its own Statutes.

At the time of the Bank's initial funding, shares were allocated to the central banks of its five member nations and the United States. Two countries, France and Belgium, did not purchase their full subscription of shares and the remainder were sold to the public. Additionally, the United States's central bank was precluded by the politics of the time from participating in an international organization, and, thus, did not purchase any of its allotted shares, all of which were sold publicly. At the time of the buyback at issue in this case, approximately 14% of the Bank's shares were publicly held and 86% were owned by

central banks. First Eagle, a U.S. registered mutual fund, owned approximately 12.5% of the publicly held shares.

In September 2000, the Bank announced it would hold a meeting of its central bank members on January 8, 2001, to vote on an amendment to its Statutes allowing a mandatory redemption of all public shares. The mandatory redemption plan was apparently motivated by problems inherent in the restricted market for public Bank shares and by the tension between the Bank's purpose of promoting international financial cooperation and a publicly owned company's goal of maximizing profit to shareholders. The plan called for the Bank to cancel the registrations of all of the public shares, redistribute these shares to the central banks, and then issue a statutory right of payment of 16,000 Swiss francs (approximately $10,000) per share to the public shareholders. This share valuation was established on the advice of J.P. Morgan, the Bank's financial advisor, and was independently evaluated as fair by Arthur Andersen.

The Bank sent a notice to all its public shareholders on September 15, 2000, announcing that the mandatory redemption would occur immediately if the implementing amendment was approved at the meeting on January 8, 2001. The notice specified that the stock registrations would be canceled without further formalities and that the public shareholders would receive compensation after surrendering their share certificates. Although the notice did not say as much, the Bank's Statutes specify that any disputes concerning the interpretation or application of the charter and its Statutes—including an amendment such as the one at issue here—"shall be referred for final decision" to the arbitration tribunal established by the Hague Agreement of 1930. This tribunal has of course long since disbanded, but a replacement tribunal now exists which is comprised of arbitrators appointed by the Bank's five member nations.

First Eagle, in a series of letters that began on September 29, 2000, informed the Bank that it believed the valuation price for the shares was unfair and that the mandatory redemption was unauthorized. Despite the mandatory arbitration provision governing the dispute, on January 5, 2001, First Eagle filed suit in federal district court seeking damages. On January 8, 2001, the central banks approved the Bank's redemption plan at the meeting and the registration of all public shares was canceled. On January 16, 2001, eight days after its shares were canceled, First Eagle filed an amended complaint seeking a preliminary injunction and simultaneously filed a motion for a TRO.

In its TRO motion, First Eagle claimed that (1) the Bank exceeded its authority in amending the Statutes to render the public shares redeemable; (2) the valuation methods employed by J.P. Morgan and approved by Arthur Andersen were flawed and resulted in an undervaluing of the shares; and (3) the Bank violated disclosure obligations under United States securities laws, particularly the Williams Act, 15 U.S.C. § 78m(e)(1) (2000). The motion sought to prevent the Bank from paying public shareholders for their tendered shares until the Bank complied with the Williams Act. The district court heard the TRO motion the same day it was filed and denied it on January 24, 2001, on the ground that First Eagle had failed to establish irreparable harm. This appeal followed.[1]

---

1. In addition to filing a notice of appeal, First Eagle moved for an injunction pending appeal and for an expedited appeal. We heard oral argument on First Eagle's motions on January 30, 2001, and denied its request for interim injunctive relief. We did, however, grant the motion for an expedited appeal.

## DISCUSSION

■ The denial of a TRO is "ordinarily not appealable." *Office of Personnel Mgmt. v. Am. Fed. of Gov't Employees, AFL–CIO,* 473 U.S. 1301, 1303–04, 105 S.Ct. 3467, 87 L.Ed.2d 603 (1985) (Burger, Circuit Justice); *see also United States v. Miller,* 14 F.3d 761, 764 (2d Cir.1994). A narrow exception has been established where the district court's order effectively disposes of the litigation and "might have a 'serious, perhaps irreparable, consequence,' [that] ... can be 'effectually challenged' only by immediate appeal[.]" *Carson v. Am. Brands, Inc.,* 450 U.S. 79, 84, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) (quoting *Baltimore Contractors, Inc. v. Bodinger,* 348 U.S. 176, 181, 75 S.Ct. 249, 99 L.Ed. 233 (1955)); *see also ContiChem LPG v. Parsons Shipping Co.,* 229 F.3d 426, 430 (2d Cir.2000); *Romer v. Green Point Sav. Bank,* 27 F.3d 12, 15 (2d Cir. 1994). This standard has not been met here.

■ As the district court found, First Eagle does not face irreparable harm in this case, much less harm that can only be avoided by an interlocutory appeal to this Court. The Bank's alleged violation of United States securities laws will force First Eagle to make the irrevocable decision between tendering its shares or taking legal action against the Bank, the district court found, and we agree, that any injury suffered by First Eagle as a result of the Bank's actions can be adequately redressed by monetary damages. Indeed, the primary complaint advanced by First Eagle appears to be that the valuation methods employed by J.P. Morgan and Arthur Andersen undervalued the privately held shares. Should First Eagle suc-

ceed in this complaint, its injury can be fully compensated by an award in the district court or in the mandatory arbitration forum designated by the Bank's Statutes.

■ Moreover, the district court is poised to hear First Eagle's motion for a preliminary injunction as soon as our decision in this case is handed down. Although First Eagle argues that the Bank's alleged violation of United States Securities law will force First Eagle to make an uninformed and irrevocable decision between tendering its shares or taking legal action against the bank, it has made no showing that it will be required to tender its shares before its preliminary injunction motion is considered or, for that matter, before it has had the opportunity to fully litigate and/or arbitrate its claims against the Bank.[2] The district court's denial of the TRO, therefore, did not effectively dispose of the litigation as required for jurisdiction in this Court. *See Romer,* 27 F.3d at 15.

Finally, we note that First Eagle waited four months after being notified by the Bank of the buyback, and even waited until *after* the registration of private shares had been canceled in the January 8 meeting, to seek a TRO. First Eagle's timing further supports the conclusion that imminent irreparable injury is not present here. *See Huminski v. Rutland City Police Dep't,* 221 F.3d 357, 360 (2d Cir.2000) (per curiam) (stating that interlocutory appeals are "designed to deal with circumstances of some urgency").

In sum, it seems clear that no serious or irreparable consequence is likely to result from the district court's denial of a TRO to First Eagle. We have carefully consid-

---

**2.** First Eagle argues that other shareholders will also be irreparably harmed absent the grant of a TRO because they will have to make similarly irrevocable and uninformed decisions with respect to their shares. We note that because First Eagle did not file a class action, it has no standing to press the claims of other shareholders and, in turn, those claims have no relevance to First Eagle's claims.

ered First Eagle's remaining arguments in support of appealability and found them to be without merit. Accordingly, we hold that this court lacks jurisdiction over the appeal.

## CONCLUSION

For the foregoing reasons, the appeal is dismissed for lack of appellate jurisdiction.